Luis F. González, demandante y apelado, *v.* Remedios y Francisco López Quiñones y la Sucesión de Candelario Quiñones, etc., demandados y apelantes.

No. 6555.—*Sometido:* Febrero 20, 1934. *Resuelto:* Junio 4, 1934.

*Angel A. Vázquez,* abogado de los apelantes; *L. Muñoz Morales* y *E. Rincón,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

En 4 de mayo de 1929, Candelario Quiñones reconoció deber a sus sobrinos Francisco y Remedios López Quiñones, en documento auténtico otorgado ante notario, la cantidad de $383.40, que según el otorgante heredaron dichos sobrinos de sus padres Pedro López y Faustina Jovita Quiñones y de su abuela Lorenza Quiñones, y que fueron entregados a Candelario Quiñones.

En 6 de noviembre de 1930, Francisco López Quiñones promovió ante la Corte de Distrito de San Juan, bajo el No. 13,450, una demanda contra Candelario Quiñones reclamándole la deuda de $383.40 reconocida por el último, con sus intereses del 1 por ciento mensual desde julio de 1894 hasta octubre de 1930, ascendiendo la participación del referido Francisco López Quiñones a la cantidad de $1,027.51.

En su contestación a la demanda de su sobrino aceptó Candelario Quiñones el otorgamiento de la escritura y alegó que con motivo de encontrarse ya en una edad muy avanzada y desde hace muchos años abandonado por su esposa, que lo es doña Hermógenes Ascencio, y con el fin y propósito de castigar a ésta por su comportamiento desconsiderado para con él, no pudiendo por otro medio tener libre disposición de sus bienes por haberle sido revocado por aquélla, su esposa, el poder que le había sido conferido para regir y administrar dichos bienes, que se concretan a una finca rústica, única propiedad que posee, sita en el barrio Guzmán Abajo, de Río Grande, puesto de acuerdo con sus dos sobrinos, y a instancias de éstos, convinieron en simular, como simularon, una deuda, para que, ocurrido su fallecimiento, sus referidos so-

brinos se incautaran de su propiedad en cobro de la expresada deuda así reconocida por él; que en consideración a ese convenio falso y simulado fué que se otorgó la escritura de reconocimiento de deuda, comprometiéndose ambos hermanos a otorgar y suscribir un documento privado en el que éstos se comprometieran a no instar el cobro de la expresada deuda durante la vida del supuesto deudor, y cuyo documento privado no solamente no ha sido otorgado por sus sobrinos mencionados, sino que, por el contrario, han tratado y tratan de ejercitar el cobro de dicha deuda por la vía judicial.

El día señalado para la vista de este caso el abogado de Candelario Quiñones, quien había presentado una moción de suspensión que fué declarada sin lugar, manifestó que no teniendo su prueba en la corte en aquellos momentos no podía entrar en juicio, y se retiró. Celebrada la vista, la corte dictó sentencia con fecha 25 de marzo de 1931, condenando al referido Candelario Quiñones a pagar al demandante Francisco López Quiñones la cantidad reclamada.

En 11 de marzo de 1931 Remedios López Quiñones radicó otra demanda en la Corte de Distrito de San Juan, bajo el No. 14,183, contra el mismo Candelario Quiñones, reclamándole el pago de $1,027.51, procedente de la deuda reconocida en escritura pública por el demandado.

Contestó el demandado bajo juramento, alegando la simulación de la alegada escritura de 4 de marzo de 1929, en términos idénticos a los que utilizara al contestar la demanda interpuesta por Francisco López Quiñones.

El demandado Candelario Quiñones falleció en 2 de julio de 1931, estando pendiente esta acción, y sus herederos Juan Bernabe, León Quiñones y María Hermógenes Ascencio pidieron que se les tuviera como subrogados en el caso y solicitaron sentencia declarando con lugar la demanda por haberse convencido después de una minuciosa investigación de que los hechos alegados en la misma por el demandante son completamente ciertos. La corte dictó sentencia condenando

a los demandados a satisfacer la suma reclamada en la demanda.

Con fecha 13 de febrero de 1931 el ahora demandante Luis F. González promovió en la corte de distrito, bajo el número 14,021, demanda en cobro de dinero contra Candelario Quiñones, por la cantidad de $2,987.78, procedentes $2,485 de servicios profesionales y $502.78 de cantidades en efectivo que según se alega prestara González a Quiñones. Éste fué emplazado el mismo día, pidió prórroga para contestar el 24 de febrero, y dos días después presentó una moción reconociendo la certeza y legitimidad de las cantidades reclamadas y renunciando su derecho de apelación, a fin de que la referida sentencia fuese firme y ejecutable inmediatamente. El 28 de febrero de 1931 la corte dictó sentencia en la forma solicitada.

Basándose en los hechos anteriormente relacionados es que se inicia la presente acción.

Luis F. González demanda a Remedios y Francisco López Quiñones y a la sucesión de Candelario Quiñones, compuesta de sus hijos y su viuda, alegando que es nulo el reconocimiento de deuda hecho por Candelario Quiñones a favor de sus sobrinos por ser falso y simulado y ser el producto de una confabulación en perjuicio de acreedores, y que son nulas también las sentencias obtenidas por Francisco y Remedios López Quiñones contra Candelario Quiñones como consecuencia de los pleitos civiles Nos. 13,450 y 14,183. Se alega que estas sentencias son nulas por ser falsa la causa que les dió origen y porque el reconocimiento de deuda es una simulación en fraude de acreedores.

Alega el demandante que Remedios López Quiñones ha obtenido una orden de ejecución de sentencia en el pleito seguido contra Candelario Quiñones y ha señalado la venta judicial de una finca de cuarenta y tres cuerdas de terreno, que es la única propiedad conocida del deudor, con perjuicio de los derechos del demandante, quien tiene preferencia sobre las sentencias obtenidas por los demandados en cuanto a la fecha en que quedaron firmes. Se alega además que con ex-

cepción del inmueble mencionado, Candelario Quiñones, hoy sus herederos, carece de otros bienes en los cuales pueda el demandante hacer efectivo su crédito.

Niegan los demandados las alegaciones esenciales de la demanda, y que las sentencias por ellos obtenidas contra Candelario Quiñones perjudiquen al demandante y le impidan cobrar su crédito, y alegan que Candelario Quiñones no sólo poseía la finca embargada por los demandados sino también otra finca rústica conocida por el demandante e inscrita sin gravamen en el registro de la propiedad, y otros bienes muebles y semovientes, también conocidos por el demandante.

Niegan además los demandados que la sentencia obtenida por el demandante tenga preferencia sobre la que obtuvo Francisco López Quiñones, quien con mucha anterioridad a la sentencia dictada en favor del primero embargó los bienes objeto de este pleito, anotando su embargo en el registro de la propiedad. Asimismo se niega que con anterioridad al 4 de mayo de 1929 existiera alguna deuda de Candelario Quiñones a favor del ahora demandante, y se alega que después del pleito establecido por Francisco López Quiñones contra Candelario Quiñones, el demandante y dicho Candelario Quiñones se pusieron de acuerdo para perjudicar los derechos de los demandados y, llevando a cabo tal acuerdo, inició el demandante una acción contra el susodicho Candelario Quiñones, quien rápidamente se allanó a la demanda, mientras dilataba la contestación a la de Francisco López Quiñones, y solicitó sentencia en su contra, pidiendo que fuese declarada firme y ejecutable enseguida, todo ello con el fin de que el ahora demandante obtuviera un crédito por sentencia y pudiera alegar contra estos demandados un derecho sobre preferencia de crédito y destruirles así su derecho a cobrar de los bienes de Candelario Quiñones.

La corte inferior dictó sentencia declarando nulo el reconocimiento de deuda hecho por Candelario Quiñones a favor de sus sobrinos Francisco y Remedios López Quiñones, decretando la nulidad de las sentencias obtenidas por Francisco

y Remedios López Quiñones contra Candelario Quiñones y su sucesión, por ser falsa e inexistente la causa que les dió origen y haber sido obtenidas en fraude de acreedores, y declarando preferente el crédito del demandante para ser cobrado de cualesquiera de los bienes del deudor Candelario Quiñones o sus herederos· subrogados. También se condenó a los demandados al pago de las ''costas, gastos y desembolsos del abogado de la parte actora, por estimar el tribunal manifiesta contumacia por su parte en esta acción.''

■ Se alega en primer término que la corte erró al dictar sentencia a favor del demandante, ya que éste no demostró que tiene derecho a perturbar las sentencias firmes dictadas en pleitos en el que no fué parte. Entienden los demandados que la corte sentenciadora debió haber sostenido la alegación que los mismos establecieron con respecto a la nulidad e inexistencia de la sentencia recaída en virtud del allanamiento de Candelario Quiñones a la demanda promovida contra él por el Dr. Luis F. González. Arguyen los apelantes que esta moción no está suscrita ni jurada personalmente por el demandado Candelario Quiñones ni por su abogado, ni se hace en ella bajo juramento una exposición de los hechos origen de la deuda ni se demuestra que la suma confesada se debe en justicia. La moción solicitando sentencia y renunciando el derecho de apelación, suscrita por el abogado de Candelario Quiñones, dice así:

''El demandado en este caso, por su abogado que suscribe, comparece ante la Hon. Corte, y, respetuosamente, expone y solicita:

''Primero: Que el demandado ha sido debidamente emplazado de la demanda contra él interpuesta por el demandante Dr. Luis F. González. Y siendo cierta y legítima la deuda reclamada por el actor en su demanda y no deseando el demandado entorpecer innecesariamente los procedimientos en este caso, se allana y consiente de que esta Hon. Corte dicte sentencia declarando con lugar la demanda, condenando al demandado a pagar al demandante la suma de $2,987.78 por concepto de principal, sus intereses y costas.

''Segundo: Que con el fin de que la referida sentencia pueda ser firme y ejecutable inmediatamente, el demandado renuncia el derecho de apelación para evitar así gastos y demoras innecesarias.

"Por tanto: El·demandado a la Hon. Corte suplica se sirva tener por presentada esta moción, y, por sus méritos, dictar sentencia en su contra condenándole a pagar al demandante la suma de $2,987.78, sin intereses ni costas.

"Río Piedras, P. R., Febrero 26, 1931.

" (Fdo.) Rodolfo Ramírez Pabón,
Abogado del demandado.''

Los demandados sostienen que el allanamiento así formulado infringe los preceptos del artículo 359 del Código de Enjuiciamiento Civil que dice así:

"El demandado, en una exposición escrita, firmada por él y justificada con su juramento, hará constar lo que sigue:

"1. Su autorización para que se dicte sentencia por una suma determinada.

"2. Si fuere por dinero debido o que haya de deberse, expondrá concisamente los hechos origen de la deuda, y demostrará que la suma confesada se debe o se deberá en justicia.

"3. Si fuere con el fin de garantizar al demandante contra una responsabilidad eventual, expondrá concisamente los hechos constitutivos de la responsabilidad y demostrará que la suma confesada no excede del importe de la responsabilidad.''

El artículo 358 del mismo código dice, en su texto inglés, que podrá dictarse sentencia, sin acción (*without action*), fundada en la confesión de una persona, ya sea por dinero debido o que haya de deber, o para asegurar a otra contra responsabilidades eventuales contraídas a favor del demandado, o por ambas cosas, en la forma prescrita en este capítulo. Dicha sentencia podrá dictarse por cualquier corte que tenga competencia por razón de la cuantía.

El texto castellano dice que podrá dictarse sentencia sin celebración de juicio. Este artículo es idéntico al 1132 del Código de Enjuiciamiento Civil de California.

Los demandados citan varios casos de la Corte Suprema de dicho estado para sostener su alegación de que la confesión debe ser firmada y jurada por la parte, y contener una relación concisa de los hechos origen de la deuda. El único

caso aplicable a la cuestión planteada es el de *Pond* v. *Davenport,* 44 Cal. 481, donde el demandado, después de iniciada la acción y haber sido emplazado, y antes de expirar el plazo para contestar, confesó la deuda allanándose a que se dictara sentencia. En este caso la corte se expresó así:

"La sentencia que Corbet obtuvo contra Davenport debe ser considerada una sentencia por confesión. El tiempo para contestar no había expirado y la sentencia no pudo dictarse en rebeldía y no lleva consigo la significación de ser una sentencia de este carácter. Por el contrario, se basó en una declaración jurada del demandado, allanándose a la sentencia, especificando el montante y tratando de establecer el objeto de la deuda, basada en un pagaré debido por el demandado al demandante. Claramente se intentó que fuera, y es, en su efecto legal, una sentencia por confesión."

Cuando se escribió esta opinión regían en California los artículos 374, 375 y 376 de la ley de práctica, que fueron luego incorporados en el Código de Enjuiciamiento Civil, donde figuran con los números 1132, 1133 y 1134. Estos artículos corresponden a los 358, 359 y 360 de nuestro Código de Enjuiciamiento Civil.

Convenimos con la Corte Suprema de California en que un fallo dictado después de emplazado el demandado y antes de oponerse a la demanda, es una sentencia por confesión, *cognovit actionem*; pero no compartimos el criterio del referido tribunal en cuanto aplica los artículos 374 y 375 a una confesión de esta naturaleza.

Las palabras "without action" se refieren a sentencias dictadas sin haberse instituído ninguna acción. La corte de California, sin embargo, considera incluída dentro de las disposiciones de la ley de práctica una sentencia dictada después de haberse iniciado la acción y de haberse librado y diligenciado el emplazamiento.

De acuerdo con el derecho común una sentencia por confesión es aquella dictada a favor del demandante, cuando el demandado, en vez de oponerse a la demanda, confiesa la reclamación, o en cualquier tiempo antes de la celebración del

juicio retira sus alegaciones y se aviene a que se dicte sentencia contra él. Estas sentencias, obtenidas por confesión después de promovido el pleito, se distinguen de una sentencia obtenida por confesión sin haberse instituído acción alguna, como ocurre en muchas jurisdicciones y en el estado de California.

De la obra "Black on Judgments", tomo primero, pág. 69, copiamos lo siguiente:

"Todas las sentencias dictadas mediante confesión de la parte demandada pueden dividirse en dos clases: 1. Las dictadas en pleito ordinario iniciado con el libramiento y notificación del emplazamiento; 2. Las dictadas a virtud de confesión de la parte demandada o mediante autorización a su abogado (*warrant of attorney*), sin la iniciación de un pleito. La primera clase es bien conocida al derecho común y debe ser puesta a prueba y sostenida de conformidad con las reglas y principios existentes independientemente de los estatutos, mientras que las sentencias de la última clase derivan toda su eficacia del derecho positivo y deben ajustarse, para que sean válidas, a todas las disposiciones y formalidades provistas por la legislatura. Con frecuencia resulta cuestión de importancia determinar si una sentencia específica pertenece a la primera o a la segunda clase, toda vez que de no estar comprendida por el estatuto, no es atacable por falta de una declaración jurada, reconocimiento de la deuda u otro requisito exigido por la ley. Esta distinción está reconocida por las autoridades. Así pues, un estatuto que provee que cualquier persona sin necesidad de iniciar un procedimiento, puede comparecer por sí o representada por letrado, y confesar una sentencia por cualquier deuda *bona fide*, pero que en tal caso deberá radicarse una petición y ejecutarse otros actos, no es aplicable a aquellos casos en que la parte es citada en forma ordinaria, sino sólo a casos en que existe una comparecencia personal sin haber sido notificada. En armonía con lo que antecede se ha resuelto que cuando un demandado acepta la notificación del procedimiento y luego solicita se dicte sentencia por confesión, es innecesaria la declaración jurada del demandante respecto a la justicia de la reclamación, exigida cuando se trata de una confesión sin que se inicie un pleito. Las sentencias dictadas en favor de la parte demandante por haber la demandada admitido los hechos y la ley, según las mismas son conocidas por el derecho común y conforme existen independientemente de los estatutos, son de dos clases: primero, sentencias por

*cognovit actionem,* y. segundo, por confesión *relicta verificatione.* En el primero de estos casos la parte demandada, luego de ser emplazada, en vez de comparecer y alegar, reconoce y confiesa que la causa de acción del demandante es justa y razonable. En el último caso, luego de comparecer y alegar y antes del juicio, la parte demandada hace una confesión de la causa de acción del demandante y retira o abandona su alegación, y entonces se dicta sentencia en su contra sin ir a juicio.''

Refiriéndose a las confesiones de sentencia sin acción, dice el mismo autor en la página 71:

''Una manera de confesar una sentencia sin necesidad de que se inicie pleito o procedimiento es mediante un *warrant of attorney.* Esto es una autorización dada por el deudor a determinado letrado o a cualquier letrado de los admitidos por una corte o en determinada jurisdicción, facultándole para que comparezca a nombre del demandado y confiese sentencia por una suma que se designa. Este sistema difiere de un *cognovit* en que hay que iniciar una acción antes de poderse registrar un *cognovit,* mas no antes del otorgamiento de un *warrant of attorney.* En tanto en cuanto este procedimiento pueda ser reglamentado por el estatuto en cualquier jurisdicción, el mismo debe por supuesto cumplir estrictamente con los requisitos de la ley. Pero en la mayoría de los estados existen estatutos que autorizan que se dicte una sentencia èn virtud de la confesión de la parte demandada, sin necesidad de pleito, mediante la radicación de una declaración jurada acreditando los hechos de los cuales surge la deuda, y otra declaración jurada creditiva de que la deuda es justa y que realmente está en descubierto, y a veces mediante la observancia de ciertas formalidades adicionales. Éste es en verdad el método más corriente de confesar sentencia y por consiguiente será el que ocupará principalmente nuestra atención en este capítulo.''

Como se ve, las sentencias por confesión, después de promovido un pleito, son de dos clases: *Cognovit actionem* y *relicta verificatione.* El primer caso ocurre cuando el demandado, después de emplazado, en vez de oponerse a la demanda, confiesa la causa de acción; el segundo caso ocurre cuando el demandado, después de oponerse a la demanda y antes del juicio, confiesa la causa de acción y retira su oposición u otras alegaciones. En cada uno de estos casos la sentencia se rige por reglas y principios que tienen su origen en el derecho

común y no por las disposiciones emanadas del poder legislativo que autorizan la confesión de sentencias sin haberse promovido ningún pleito. Una acción promovida y confesada no puede impugnarse porque no la acompañe una declaración jurada, o una relación del origen de la deuda, u otros requisitos adicionales.

No hay duda de que los requisitos exigidos por el artículo 359 de nuestra Ley Procesal deben cumplirse estrictamente cuando se confiesa una reclamación, sin haberse previamente promovido una acción. ¿Deben cumplirse estos requisitos cuando se confiesa una deuda después de radicada la demanda y de haberse emplazado a la parte demandada? La Corte Suprema de California ha resuelto que sí en el caso de *Pond* v. *Davenport*, supra. No puede, a nuestro juicio, mantenerse este criterio, a menos que lleguemos a la conclusión de que los requisitos que se exigen para las confesiones sin haberse instituído pleito alguno se apliquen también a las confesiones que se hagan después de haberse promovido el pleito. La letra de la ley es clara y no parece autorizar esta interpretación.

El artículo 359 requiere que la parte que confiesa, cuando se trata de una suma de dinero, exponga concisamente los hechos origen de la deuda y demuestre que la suma confesada se debe o se deberá realmente. El objeto de esta relación, según la Corte Suprema de California (*Cordier* v. *Schloss*, 18 Cal. 582), es poner a los acreedores sobre la pista y colocarlos en condiciones de descubrir el fraude en caso de que exista. Parece lógico que no se exija esta relación cuando se ha promovido una acción y se ha hecho una relación en la demanda de los hechos origen de la deuda. En este caso, los acreedores pueden adquirir conocimiento de estos hechos, sin necesidad de que el demandado repita las alegaciones de la demanda. El artículo 359, a nuestro juicio, es aplicable únicamente a las confesiones que ocurren antes de haberse promovido una acción.

Se arguye en segundo término que la prueba es in-

suficiente para sostener la sentencia y que la corte cometió error manifiesto al apreciarla. La escritura de reconocimiento de deuda otorgada por Candelario Quiñones a favor de sus sobrinos Francisco y Remedios López Quiñones tiene fecha 4 de mayo de 1929. Alega el demandante que Candelario Quiñones hizo este reconocimiento con el único objeto de burlar los derechos de su esposa y de sus acreedores en aquella fecha. Para llegar a la conclusión de que este reconocimiento tuvo el objeto de defraudar al demandante, éste ha debido probar que para aquella fecha era acreedor de Candelario Quiñones, quien entonces carecía de bienes suficientes para cubrir la obligación reconocida y la contraída con el propio demandante. Aun así, quizás podría decirse que el reconocimiento de la deuda en nada impidió al demandante hacer efectiva en los bienes de su deudor una obligación exigible. En cuanto a su condición de acreedor, en la demanda que inició el demandante contra Candelario Quiñones y que fué confesada por éste, se alegó que en 14 de julio de 1928 el referido Candelario adeudaba al Dr. González $785 por servicios profesionales. La existencia de esta deuda, asumiendo que sea cierta, y el reconocimiento de una obligación a favor de los sobrinos de Candelario Quiñones, no establecen, en ausencia de otra prueba, el alegado fraude en perjuicio del demandante. ¿Qué bienes tenía Candelario Quiñones al otorgarse la escritura? Si disponía de bienes suficientes para responder de la obligación reconocida y de la contraída con el Dr. González, no puede decirse que hubo propósito de fraude. No existe en los autos prueba de los bienes que pertenecían a Candelario Quiñones para esa fecha, con excepción de su propia alegación en su contestación a los pleitos iniciados contra él por Francisco y Remedios López Quiñones, de que sus bienes se concretaban a una finca rústica sita en el barrio Guzmán Abajo de Río Grande. Pero aún esta alegación no ha sido justificada, porque Candelario Quiñones, quien pudo comparecer para sostenerla a la vista de la causa iniciada contra él por su sobrino Francisco, anunció por con-

ducto de su abogado que se retiraba de la vista porque no tenía la prueba en la corte en aquellos momentos.

No hay prueba tampoco en los autos del precio de esta finca que se alega constituía la única propiedad de Candelario Quiñones. Sumados el alegado crédito del Dr. González en 14 de junio de 1928 y la obligación reconocida a favor de los sobrinos de Candelario en 4 de mayo de 1929, arrojan aproximadamente un total de $2,800. No es cierto que Candelario Quiñones poseyera una sola finca. Precisamente el 14 de julio de 1928 aparece el Dr. González tomando en arrendamiento dos fincas de la propiedad del referido Candelario Quiñones; una de cuarenta y tres cuerdas y otra de nueve, ambas inscritas en el registro de la propiedad. Estas dos fincas lindan entre sí por uno de sus lados, y porque están unidas el Dr. González declara que se trata de una sola finca, cuando él mismo reconoce que son dos esas fincas en el contrato de arrendamiento, que en su cláusula quinta dice así:

"En lo que concierne a las cercas de las fincas arrendadas, es claridad y así queda expresamente convenido entre las partes que el arrendador señor Quiñones deberá recorrerlas lo antes posible a fin de que las dos fincas queden debidamente cercadas de maya y alambre, siendo por cuenta del arrendatario señor González en lo adelante la conservación y reparación de dichas cercas, quedando obligado a entregarlas en el mismo estado en que las recibe."

El hecho de que las fincas estén unidas y que pertenezcan a un solo dueño no implica que hayan sido agrupadas para constituir un solo inmueble y que las nueve cuerdas estén incluídas en "la masa de las cuarenta y tres cuerdas" como afirma el Dr. González. El contrato de arrendamiento describe ambas fincas con distintas colindancias, y el testimonio de los hijos de Candelario Quiñones es claro en cuanto a la existencia de un inmueble de una cabida de cuarenta y tres cuerdas y otro de una cabida de nueve.

El demandante alega que en la hipótesis de que la deuda reconocida existiera y que se hubiese originado en el año 1894, como se dice en la escritura de reconocimiento, Can-

delario Quiñones renunció en 4 de mayo de 1929, un derecho de prescripción que había adquirido. El demandante entiende que puede utilizar la prescripción, aunque haya sido renunciada por el deudor.

De acuerdo con el artículo 1837 del Código Civil, edición 1930, los acreedores y cualquier otra persona interesada en hacer valer la prescripción, podrán utilizarla a pesar de la renuncia expresa o tácita del deudor o propietario. Esta potestad, sin embargo, está subordinada a lo dispuesto en el artículo 1064 del Código Civil, edición 1930, según el cual los acreedores, después de haber perseguido los bienes de que esté en posesión el deudor para realizar cuanto se les debe, pueden ejercitar todos los derechos y acciones de éste con el mismo fin, exceptuando los que sean inherentes a su persona. *Berríos* v. *R. R. M. M. Carmelitas,* 3 D.P.R. 306.

Entendemos que para que el demandante pueda hacer uso del derecho concedido por este artículo ha debido probar que cuando se otorgó la escritura de reconocimiento de deuda, los bienes de Candelario Quiñones no eran suficientes para cubrir su crédito y la deuda que considera simulada. Sobre este extremo no hay prueba alguna en los autos. El demandante pudo haber reclamado y ejecutado su crédito en aquella fecha. El reconocimiento de deuda no constituía un gravamen sobre los bienes del supuesto deudor, y el Dr. González no estuvo impedido, ni entonces ni después, de ejercitar sus derechos, y de hacerlos efectivos en los bienes de su alegado deudor. Desde el 4 de mayo de 1929 hasta el 25 de noviembre de 1930, en que Francisco López Quiñones embargó la finca de cuarenta y tres cuerdas, anotando su embargo en el registro de la propiedad, transcurrieron más de diez y ocho meses. La demanda de Francisco López Quiñones se inició en 6 de noviembre de 1930. Durante todo este tiempo la referida finca estuvo libre de trabas y el demandante tuvo la oportunidad de dirigirse contra ella. El Dr. González demandó a Candelario Quiñones en 13 de febrero de 1931. La deuda fué confesada en 26 de dicho mes y el día 28 se dictó sentencia por

la corte. En 6 de julio de 1931 el Dr. González hizo registrar su sentencia en el registro de la propiedad.

El demandante alega que ha perseguido todos los bienes de Candelario Quiñones y que el único bien en su posesión es la finca de cuarenta y tres cuerdas de tierra que había sido embargada por Francisco López Quiñones. Hemos demostrado que Candelario Quiñones poseía además una finca de nueve cuerdas, que aparece inscrita a su nombre en el registro de la propiedad. No se probó, como ya dijimos antes, el valor de ninguna de estas fincas. No sabemos, por lo tanto, si estos bienes bastan o no para cubrir la deuda reconocida y la reclamación del Dr. González. Juan V. Quiñones Ascencio, hijo de Candelario Quiñones, declara que además de las dos fincas, su padre dejó media cuerda de tierra donde poseía una casa en el ciclón de San Felipe y como cinco o seis bestias que tenía en las fincas arrendadas por el Dr. González.

Este es un caso en que ambas partes, demandante y demandados, se acusan mutuamente de haberse puesto de acuerdo con Candelario Quiñones para perjudicar los derechos de unos y otros. La prueba aportada no resulta todo lo clara que fuera de desear. Se ofreció alguna prueba que no fué admitida y que quizás pudo arrojar alguna luz sobre las cuestiones en controversia. El reconocimiento de deuda ha podido ser simulado y hay indicios de que lo fué. La reclamación del Dr. González tampoco está libre de sombras. La conducta de Candelario Quiñones en uno y otro casos no puede inspirar confianza. Pero, como ya hemos dicho, aunque el crédito del demandante sea legítimo, no es posible dictar sentencia a su favor, porque no ha probado que fuese perjudicado por el reconocimiento de la deuda a favor de los sobrinos de Candelario Quiñones en 4 de mayo de 1929.

*Debe revocarse la sentencia y dictarse otra en su lugar declarando sin lugar la demanda, sin especial condenación de costas.*

El Juez Asociado Señor Wolf está conforme con el resultado.

858

En este caso el abogado de la parte demandante presentó una moción solicitando la reconsideración de la sentencia dictada por esta corte en 4 de junio del corriente año. Resolvimos no haber lugar a la moción referida, y ahora comparece nuevamente el demandante, por conducto de su abogado, alegando que su moción se desestimó de plano y que el detenido estudio que en esos ·alegatos tiene hecho el abogado del demandante le autoriza para sostener de buena fe que existe en este caso una cuestión de derecho fundamental que merece la atención de este tribunal en bien de la justicia, por cuanto se ha de decidir si hay una distinción real entre la rescisión y la nulidad de un contrato.

Comienza el demandante alegando que la sentencia dictada por la Corte de Distrito de San Juan en el caso de *Luis F. González* v. *Candelario Quiñones,* en 28 de febrero de 1931, es válida y eficaz. En términos generales hemos sostenido

que los requisitos exigidos por el artículo 359 del Código de Enjuiciamiento Civil deben aplicarse en casos de confesiones de reclamaciones respecto de las cuales no se hubiera previamente promovido alguna acción, y no en aquéllos en que la confesión se hace después de radicada la demanda y de emplazado el demandado, como ocurrió en la reclamación promovida por el Dr. González. Autorizadas por la ley las sentencias así dictadas, es claro que no dejan de ser válidas por el hecho de que se haya confesado una deuda luego de iniciado un pleito, ya que los hechos contenidos en la demanda ofrecen la misma garantía que la relación concisa de hechos exigida al deudor sobre el origen de la deuda cuando no se ha promovido ningún litigio, para poner a los acreedores sobre la pista y colocarlos en condiciones de descubrir el fraude en caso de que exista. *Cordier* v. *Schloss*, 18 Cal. 582.

■■ Analiza el demandante en su alegato la prueba aportada para demostrar que es simulada y fraudulenta la deuda reconocida por Candelario Quiñones a favor de los demandados, y expone entonces las razones que a su juicio demuestran que tal fraude afecta al demandante apelado Luis F. González. Partiendo de la base de la alegada simulación, sobre la cual hablaremos más adelante, examinaremos la prueba teniendo en cuenta los argumentos del demandante, para ver si fué realmente afectado por dicha simulación en la fecha en que se llevó a cabo, o si, como alega, resulta perjudicado por la misma en la actualidad.

Comienza el demandante por citar una parte de nuestra opinión que nosotros transcribimos, complementándola, para que pueda interpretarse correctamente el sentido de nuestras palabras:

"¿Qué bienes tenía Candelario Quiñones al otorgarse la escritura? Si disponía de bienes suficientes para responder de la obligación reconocida y de la contraída con el Dr. González, no puede decirse que hubo propósito de fraude. No existe en los autos prueba de los bienes que pertenecían a Candelario Quiñones para esa fecha, con excepción de su propia alegación en su contestación a los pleitos ini-

ciados contra él por Francisco y Remedios López Quiñones, de que sus bienes se concretaban a una finca rústica sita en el barrio Guzmán Abajo de Río Grande. Pero aun esta alegación no ha sido justificada, porque Candelario Quiñones, quien pudo comparecer para sostenerla a la vista de la causa iniciada contra él por su sobrino Francisco, anunció por conducto de su abogado que se retiraba de la vista porque no tenía la prueba en la corte en aquellos momentos.''

Comentando esta parte de nuestra opinión se expresa así el demandante:

''En primer lugar sostenemos que esa manifestación que ahora se menciona de Candelario Quiñones, por conducto de su abogado, no puede tener ni tiene el alcance legal, ni siquiera el gramatical, que se le atribuye, pues allí no se niega ni contradice la certeza de aquella alegación jurada; allí no se afirma que Candelario Quiñones tenga otros bienes; ni la demanda interpuesta por Francisco López en el caso Civil No. 13450 contiene alegación alguna sobre la existencia de bienes del demandado según puede verse de su texto; esa demanda que está jurada se limita a la liquidación y cobro del supuesto crédito reconocido en la citada escritura de 4 de mayo de 1929.

''En segundo lugar deben tenerse en cuenta las circunstancias en que tal manifestación se hizo y el porqué se hizo; y el récord dice que la vista del caso fué señalada en orden especial para el 10 de mayo de 1931; que en 4 de marzo se radicó una solicitud de intervención; que el día 9 todavía no había sido resuelta esa solicitud; y entonces fué que el demandado Candelario Quiñones radicó su moción de suspensión, y esta moción de suspensión, así como la de intervención formulada por Luis F. González fueron denegadas por la Corte en sus resoluciones la misma fecha 10 de marzo; y se celebra la vista, y en ese acto y en esas condiciones es que comparece el abogado del demandado Candelario Quiñones y allí en Corte abierta hace la manifestación a que se refiere el Juez en su relación del caso; y dice el Juez que el abogado manifestó *que no teniendo su prueba en la Corte en aquellos momentos no podía entrar en juicio'*, y se retiró de la Corte.

''El hecho de no tener su prueba en la Corte *en aquellos momentos*, ¿significa que carecía en absoluto de prueba? ¿Significa que se confiesen los hechos de la demanda cuando existe una contestación jurada negándolos? Significa que el demandado posee otros bienes además de los que menciona en la citada contestación . . . y, en fin, ¿no

significa nada la nueva declaración jurada que hace el propio Candelario Quiñones cinco meses después, en 1ro. de junio del mismo año, al contestar la demanda de Remedios López (Caso Civil No. 14183) en que ratifica con más énfasis aquellas mismas declaraciones?"

Mencionamos, a mayor abundamiento, la manifestación de Candelario Quiñones expresando que sus bienes se concretaban a una finca rústica, porque quisimos poner de manifiesto todo cuanto pudiese relacionarse con esta cuestión; pero bien pudimos ignorarla, ya que una manifestación que se vierte sin que la parte a quien pueda afectar haya tenido la oportunidad de repreguntar, carece de valor probatorio. Se arguye que en el pleito contra Candelario Quiñones no se negó ni contradijo la certeza de su manifestación; pero el abogado de la parte demandante se olvida de que en este pleito se discute esta cuestión, y que los demandados no pueden ser afectados por lo que entonces dijera Candelario Quiñones, porque ni antes ni ahora han tenido la oportunidad de utilizar el derecho de repreguntar sobre la referida manifestación.

En cuanto a que deben tenerse en cuenta las circunstancias en que tal manifestación se hizo, bueno es hacer constar algunos detalles relacionados con este particular. La demanda de Francisco López Quiñones contra Candelario Quiñones se radicó en 6 de noviembre de 1930. En 14 de noviembre del mismo año el demandado solicitó una copia literal y auténtica de la escritura pública del mes de julio de 1894, origen de la deuda, y otra copia literal y auténtica de la escritura de fecha de 4 de mayo de 1929, que aparece autorizada por el propio Candelario Quiñones, y solicitó diez días para contestar la demanda a contar desde la fecha en que se le suministrasen dichas copias. El mismo día 14 de noviembre la corte declaró sin lugar la moción y concedió una prórroga de quince días al demandado para presentar sus alegaciones contra la demanda. En 26 de noviembre del mismo año el demandado solicitó que se eliminase el juramento de la demanda. En 12 de diciembre la corte declaró sin lugar la moción de eliminación y concedió diez días al demandado

para radicar su contestación. En 23 de diciembre el demandado solicitó una nueva prórroga de veinte días para contestar la demanda, que le fué concedida. En 13 de enero de 1931 se radicó la contestación. En 25 de febrero el demandado fué notificado de que la vista del caso había sido señalada para el 10 de marzo de 1931 a las nueve de la mañana. El 9 de marzo el demandado solicitó la suspensión de la vista, basándose en que había sido notificado de una demanda de intervención. La corte declaró sin lugar la moción al día siguiente, por haber denegado en la misma fecha el permiso para intervenir solicitado por Luis F. González. Entonces fué que el abogado de Candelario Quiñones anunció que se retiraba de la vista porque no tenía la prueba en la corte en aquellos momentos.

Según el demandante cuando Candelario Quiñones en su declaración jurada dijo que únicamente poseía una finca rústica, se ajustó a la realidad de la verdad, porque es de hecho una sola finca, en un solo cuerpo, compuesta de dos parcelas adquiridas por títulos diferentes. Arguye que es un hecho frecuentísimo y muy conocido que muchos propietarios van adquiriendo y formando sus fincas por compras parciales por distintos títulos que quedan inscritos en el registro separadamente, sin ocuparse de hacer alguna agrupación legal o registrable, y que en realidad es una sola finca y como tal la tienen y administran, aunque para los efectos legales y de titulación hayan de considerarse separadamente.

Precisamente para los efectos legales es que esas dos fincas tienen que considerarse necesariamente separadas. De acuerdo con la ley el acreedor puede impugnar los actos que el deudor haya realizado en fraude de su derecho, después de haber perseguido los bienes de que esté en posesión el deudor. Para que el demandante pueda decir que la alegada simulación se realizó en fraude de su derecho, ha debido probar que Candelario Quiñones carecía de bienes para cubrir sus compromisos, incluyendo la deuda simulada, y ha debido perseguir todos los bienes del deudor. El demandante no ha

realizado gestión alguna para perseguir la finca de nueve cuerdas que considera "incluída en la masa de las cuarenta y tres," y es obvio que no puede apoderarse del predio más pequeño ejecutando el de mayor cabida. Ambas parcelas de terreno tienen diferentes colindancias, y mientras no se agrupen en una sola y se determinen las colindancias de la finca agrupada no pueden ser ejecutadas conjuntamente. No surge de los autos que sobre la finca de nueve cuerdas exista traba alguna, y si ello es así el demandante está en condiciones de ejercitar cualquier derecho que tenga sobre la misma.

A juicio del demandante la única consecuencia del tecnicismo legal en que esta corte se detiene es que en vez de tratarse de una finca de cuarenta y tres cuerdas se trata de una de cincuenta y dos, lo que en nada afecta a la "declaración del interesado que no señaló número de cuerdas para identificarla sino que se refirió a su situación en un determinado barrio."

No se trata de un mero tecnicismo sino de una realidad con la cual tendría que confrontarse el demandante en caso de que pudiese ejecutar y ejecutase la finca de cuarenta y tres cuerdas. Siempre quedarían nueve cuerdas que no podrían ser afectadas por un procedimiento de ejecución dirigido contra las cuarenta y tres. El demandante tendría que señalar separadamente el otro predio más pequeño para que pudiese ser ejecutado. El testimonio del Sr. González no parece estar acorde con lo que dice en su alegato al manifestar que la única consecuencia del tecnicismo es que en vez de tratarse de una finca de cuarenta y tres cuerdas se trata de una de cincuenta y dos. El Sr. González en su declaración se refiere únicamente a cuarenta y tres cuerdas—y no a cincuenta y dos. Veamos lo que nos dice en su testimonio contestando preguntas de su propio abogado:

"P. Desde luego que en la escritura aparece que son dos fincas, una de 43 y otra de 9 cuerdas.

"R. No tay tal cosa. Todo eso es una sola finca y no hay división de ninguna naturaleza allí. Las 9 cuerdas que están incluídas

en la masa de las 43 cuerdas. Yo podría explicarlo mejor en la pizarra.

"La verdad es que toda esta colindancia y todo esto que yo he arrendado, siempre se ha tomado así, por 43 cuerdas.

"Juez: ¿Ud. ha hecho mensura de eso?

"R. Ninguna en absoluto, pero no se llama ninguna la finca *A* ni la finca *B,* sino que esa masa de terreno de Candelario Quiñones, todo el mundo la conoce allí por esa cantidad de cuerdas."

No hay duda acerca de la existencia de estas dos parcelas de terreno que deben ser perseguidas y ejecutadas separadamente, sin confundir una con otra; pero aún cuando se tratara de una sola finca de 43 cuerdas, si no se ha probado el valor de los bienes de Candelario Quiñones en la fecha en que se reconoció la deuda, es claro, a nuestro juicio, que no puede prosperar la acción ejercitada.

Alega el demandante que la situación que ha de considerarse en este caso no es la del año 1928, en que se originó el crédito del demandante González, ni la del año 1929, en que se hizo el reconocimiento simulado, sino la de 1930 y 1931, en que empezaron las actuaciones judiciales de los supuestos acreedores y en que González tuvo conocimiento de ellas para ejercitar su derecho a interponer su demanda contra Quiñones. Arguye el demandante que para esta fecha Candelario Quiñones solo tenía las dos parcelas de terreno arrendadas a su acreedor González y que la media cuerda de terreno con una casa mencionada en la opinión de este Tribunal, fundándose en la declaración de Juan B. Quiñones Ascencio, había sido vendida al propio demandante González, según declara el mismo testigo Juan B. Quiñones Ascencio contestando preguntas del abogado de los demandados. Llama la atención el demandante hacia una parte de la declaración de este testigo, que transcribimos, aunque dándole mayor extensión:

"P. ¿Qué documento es ése que yo le presento a Ud.?

"R. Éste fué un pagaré.

"P. ¿Suscrito por quién?

"R. Que hizo . . . .

"P.   ¿Suscrito por quien?

"R.   Por el Dr. Luis Felipe González.

"P.   ¿El mismo demandante que está aquí?

"R.   Sí, señor.

"P.   ¿Por qué cantidad?

"R.   Era por la cantidad de $100, pero el pagaré está por noventa dollars porque dijeron que había pagado al Sr. Luis Sánchez Vahamonde $10.00 por unas escrituras y entonces me dijeron que restaban noventa dollars.

"P.   ¿Y esa escritura por la cual él pagó $10.00, cuál es?

"R.   Es una escritura que hizo Candelario Quiñones a favor de los muchachos por una deuda.

"P.   ¿Ésa es la de reconocimiento de deuda?

"R.   Sí, señor, y ese pagaré es por media cuerda de tierra y una madera y zinc de una casa que se había caído.

"P.   ¿Entonces él sabía que existía esa otra clase de bienes?

"R.   ¡Oh, como no!, si él compró la media cuerda esa y la madera y zinc.

"DEMANDADO: Presento este documento como prueba.

"TESTIGO: En el mismo bufete del Sr. Luis Sánchez Vahamonde fué que se hizo esa transacción.

"JUEZ: ¿Qué escritura es?

"—La escritura que le otorgaron a Remedios López.

"—¿Cuándo se la otorgaron?

"—En el 29.

"—¿Qué fecha tiene ese pagaré?

"DEMANDANTE: 4 de enero del 29 y la escritura tiene fecha 4 de mayo y además esto no tiene nada que ver con eso porque esto aparece aquí que es importe de media cuerda de tierra, madera y zinc, y eso no tiene nada que ver con este pleito.

"P.   Explique esa cuestión de los $10.00 que Ud. dice que fué por el pago de una escritura.

"R.   Le debían a Luis Sánchez Vahamonde $10.00 por la escritura de los muchachos y cuando yo fuí a buscar este pagaré me extendieron el pagaré y me dijeron que le habían pagado a Luis Sánchez Vahamonde por esa escritura; esto es de enero 4 de 1929.

"P.   Y la escritura, ¿tiene 4 de mayo de 1929?

"R.   Pero como este pagaré se hizo más tarde, lo hizo y le pusieron

esa fecha. La escritura esa puede tener la fecha de 4 de mayo, pero el pagaré ese lo hicieron más tarde.

"P. ¿Más tarde o antes?

"R. Se hizo más tarde.

"P. ¿Aun cuando con esa fecha atrasada?

"R. Sí, señor, el Doctor lo sabe muy bien, él sabe que la venta era por cien pesos.

"P. ¿Entonces Ud. sostiene que así se lo dieron después de la escritura aunque con fecha atrasada?

"R. Sí, señor.

"DEMANDADO: Entonces lo ofrecemos en evidencia.

"JUEZ: Y la Corte lo deniega.

"DEMANDADO: Excepción."

La declaración de Juan B. Quiñones Ascencio, hijo de Candelario Quiñones, demuestra que el Dr. González compró los bienes que mencionamos en nuestra opinión; pero también prueba que en el año de 1929 el Dr. González suscribió, a favor de Candelario Quiñones, un pagaré de $100. Y es raro que González, quien según sus alegaciones para esa época era acreedor del referido Candelario Quiñones, autorizara un pagaré a favor de su propio deudor por la cantidad de $100, importe de un terreno y una madera que le compró.

En nuestra opinión dijimos que no hay prueba en los autos del precio de la finca que se alega constituía la única propiedad de Candelario Quiñones y que sumados el alegado crédito del Dr. González en 14 de julio de 1928 y la obligación reconocida a favor de los sobrinos de Candelario Quiñones en 4 de mayo de 1929, arrojan aproximadamente un total de $2,800. Esta suma es más bien alta que baja, porque incurrimos en el error de incluir los intereses de la deuda que se dice simulada hasta octubre de 1930, cuando debimos limitarnos al 4 de mayo de 1929, fecha en que fué la deuda reconocida. Es esta fecha la que debe tenerse en cuenta y no diciembre de 1930, como pretende el demandante. Pero aún en el caso de que pudiesen aceptarse los cálculos del de-

mandante hasta diciembre de 1930 y de que Candelario Qui-
ñones debiese toda la reclamación del Dr. González y no la
suma adeudada al tiempo de la alegada simulación, y toda la
reclamación de los hermanos López Quiñones, si no se ha
probado el valor de los bienes del deudor, no puede prospe-
rar la acción que en este caso se ejercita.

Entiende el demandante que podemos deducir el precio de
las fincas por el canon de arrendamiento fijado para ambas
parcelas. En la escritura de arrendamiento se fijó "un ca-
non de $46 trimestrales, pagadero por trimestres anticipados,
siendo por cuenta del arrendatario Sr. González el pago de
las contribuciones impuestas a las fincas arrendadas y las que
en lo sucesivo se les pudieran imponer." El demandante en
su alegato estima el valor de las fincas aproximadamente en
$2,000, tomando como base el canon de arrendamiento. No
podemos nosotros partir de esta base para justipreciar las
fincas en cuestión. El demandante admite que no se ha apor-
tado prueba directa por ninguna de las partes en cuanto al
valor de las fincas, pero dice que la corte tiene datos sufi-
cientes para deducirlo y cita el canon de arrendamiento y
una especie de cuenta que llama *liquidación apócrifa* presen-
tada por los propios demandados. Dice así el demandante:
"Si la corte examina aquella liquidación apócrifa presentada
por los propios demandados, verá que al final del primer folio
se fija el importe de la finca en $345 y luego, en el folio se-
gundo, se detallan al parecer las parcelas adquiridas en dis-
tintas fechas, dando una suma de 53¾ cuerdas con valor de
$109, lo que daría un promedio de $2 por cuerda." Aunque
es algo socorrida la posición del demandante, rechazando la
llamada liquidación por apócrifa y utilizándola en cuanto
pueda favorecerle, no nos explicamos cómo el demandante ha
podido llegar a la conclusión de que en esa llamada liquida-
ción se fija el importe de la finca o fincas de Candelario Qui-
ñones. En este documento, que no tiene fecha y que no es

fácil entender, aparece una partida de $345 seguida de estas palabras: "Importe de la finca."

Nadie que lea el referido documento puede identificar la finca que aparece valorada en $345. La partida que la menciona figura entre bienes encabezados con estas palabras: "Capital de Ensa." Y ciertamente no puede decirse que esta finca tenga relación con las dos parcelas de terreno pertenecientes a Candelario Quiñones. Es más, aunque el documento fuese auténtico y se tratara de la misma finca, no podría decirse cuándo se hizo la valoración, porque el referido documento no tiene fecha. El propio demandante en su alegato estima el valor de las fincas en $2,000 aproximadamente. Séanos lícito hacer notar en estos momentos que el Dr. González, quien dice que éstos son los únicos bienes de Candelario Quiñones y los valora en $2,000, aparece cobrándole $2,485 por servicios profesionales y además facilitándole en 1930 $502.78 en calidad de préstamo.

Como ya dijimos antes, no hay prueba alguna en los autos con respecto al valor de los bienes de Candelario Quiñones en 4 de mayo de 1929, cuando se llevó a efecto el reconocimiento de la deuda en favor de los hermanos López Quiñones. El demandante dice que no hay prueba directa y nosotros añadimos que ni directa ni indirectamente existe en los autos la prueba más remota acerca del valor de los referidos bienes en la fecha indicada.

El demandante expresa claramente en su alegato que la acción ejercitada tiene por objeto impugnar las actuaciones que el deudor Candelario Quiñones ha realizado en fraude del derecho de su acreedor, y que el fundamento legal de dicha acción es el artículo 1064 del Código Civil, edición 1930, equivalente al 1078 del Código Civil Revisado y al 1111 del Código Civil español, que dice así:

"Los acreedores después de haber perseguido los bienes de que esté en posesión el deudor para realizar cuanto se les debe, pueden

ejercitar todos los derechos y acciones de éste con el mismo fin, excep-
tuando los que sean inherentes a su persona; pueden también im-
pugnar los actos que el deudor haya realizado en fraude de su
derecho.''

Comentando este artículo dice Manresa que su segunda
parte, declaratoria de las facultades de los acreedores para
impugnar los actos fraudulentos de los deudores, es también
precepto que, por su generalidad e importancia se halla su-
bordinado a otros muchos que le completan y limitan, citando
entre ellos el de rescisión de contratos. Refiriéndose al mismo
artículo dice el ilustre comentarista:

''Es, finalmente, de interés el fallo de 25 de junio de 1927, en
el que se establece que el artículo 1111 exige como condición precisa
para impugnar los actos que el deudor haya realizado en fraude de
los acreedores que previamente se hayan perseguido los bienes del
deudor, como claramente expresa su texto, por lo que el derecho
del acreedor *es más bien expectante y supletorio, y no tiene vida
jurídica si no se demuestra la falta de patrimonio poseído por el
deudor para poder resarcirse con él;* . . . '' 8 Manresa 110.

El derecho del acreedor, como dice Manresa, es más bien
expectante y supletorio, y si no se ha demostrado la falta de
patrimonio poseído por el deudor para cubrir la reclamación
del Dr. González, no puede ciertamente dictarse un fallo a su
favor.

Dice el demandante que hemos eludido en nuestra opinión
hacer ninguna declaración concreta sobre la simulación del
reconocimiento de deuda.

El último párrafo de la opinión emitida por nosotros dice
así:

''Éste es un caso en que ambas partes, demandante y demandados,
se acusan mutuamente de haberse puesto de acuerdo con Candelario
Quiñones para perjudicar los derechos de unos y otros. La prueba
aportada no resulta todo lo clara que fuera de desear. Se ofreció
alguna prueba que no fué admitida y que quizás pudo arrojar alguna
luz sobre las cuestiones en controversia. El reconocimiento de deuda

ha podido ser simulado y hay indicios de que lo fué. La reclamación del Dr. González tampoco está libre de sombras. La conducta de Candelario Quiñones en uno y otro caso no puede inspirar confianza. Pero, como ya hemos dicho, aunque el crédito del demandante sea legítimo, no es posible dictar sentencia a su favor, porque no ha probado que fuese perjudicado por el reconocimiento de la deuda a favor de los sobrinos de Candelario Quiñones en 4 de mayo de 1929.''

Sostenemos nuestras conclusiones. No teníamos necesidad de hacer ninguna declaración concreta sobre la alegada simulación, toda vez que el demandante no probó que Candelario Quiñones careciese de bienes para cubrir su reclamación. Sin embargo, dijimos que el reconocimiento de deuda pudo haber sido simulado y hay indicios de que lo fué. El demandante entiende que hay prueba robusta en los autos para concluir que toda la deuda reconocida constituye una simulación. Nuestras palabras se basaron en el contenido de la escritura otorgada en 4 de mayo, 1929, donde se hacen las siguientes declaraciones:

''PRIMERO: El primer compareciente señor Quiñones dice que por consecuencia de la muerte de don Pedro López y de la esposa de éste, doña Faustina Jovita Quiñones, padre y madre de los otros comparecientes, él recibió para estos dos hermanos la suma de CIEN DÓLARES así como un novillo que pertenecía al otro compareciente, don Francisco López, lo mismo que recibió OCHENTA DÓLARES importe de una casa que vendió, perteneciente a dichos hermanos comparecientes de la segunda parte por el concepto de herencia de sus referidos fallecidos padres.

''SEGUNDO: Que asimismo reconoce el compareciente de la primera parte señor Quiñones, que por el concepto de herencia de la abuela de los comparecientes de la segunda parte, doña Lorenza Quiñones, le correspondió a dichos dos hermanos la suma de CIENTO OCHENTA DÓLARES, procedente de una casa vendida a los señores Matta y un novillo, cuya casa se vendió en CIENTO CINCUENTA DÓLARES y el novillo en TREINTA DÓLARES.

''TERCERO: Que por consecuencia de ser por aquel entonces dichos dos hermanos comparecientes de la segunda parte menores de edad,

el compareciente de la primera parte señor Quiñones no pudo entregarlos a dichos dos hermanos, razón por la que hoy día le está adeudando; por haberse apropiado de ello, invirtiendo su importe montante a TRESCIENTOS OCHENTITRÉS DÓLARES cuarenta centavos, en su propio beneficio.

"CUARTO: Y como dichos dos hermanos comparecientes de la segunda parte le exigen ahora una declaración del reconocimiento de dicha deuda y además que le paguen el importe de intereses correspondientes a dichos TRESCIENTOS OCHENTITRÉS DÓLARES cuarenta centavos, de acuerdo con lo convenido, OTORGAN:

"A. Declara don Candelario Quiñones, compareciente de la primera parte, que es en deber a sus dos sobrinos, comparecientes de la otra parte, llamados don Francisco y don Remedios López Quiñones, la suma de TRESCIENTOS OCHENTITRÉS DÓLARES, cuarenta centavos, procedentes de las dos herencias expresadas en las precedentes cláusulas, la cual suma se obliga a pagar tan pronto sus dos referidos sobrinos se lo exijan, con interés al tipo del uno por ciento mensual, a partir desde el mes de julio de mil ochocientos noventicuatro."

Según la parte de la escritura que hemos transcrito, los bienes que en la misma se mencionan proceden de Pedro López, quien murió en 1889, y de Jovita Quiñones y Lorenza Quiñones, quienes murieron en 1912. Aquí es donde surge un indicio de simulación, por lo menos en cuanto a los intereses, porque no se explica que Candelario Quiñones se aviniera a satisfacerlos desde 1894, cuando parte de los bienes que dice correspondieron a los hermanos López Quiñones por concepto de herencia, proceden de Lorenza Quiñones, quien murió en 1912. Lo mismo puede decirse con respecto a los bienes de Jovita Quiñones, quien murió también en 1912.

Francisco López Quiñones nació en junio de 1883. Dionisio Remedios López Quiñones nació en 9 de octubre de 1886. De manera que ambos eran mayores de edad cuando murieron Jovita y Lorenza Quiñones. Candelario Quiñones, en la escritura, dice que no pudo entregar en aquel entonces los bienes a dichos dos hermanos porque eran menores de edad. Cuando dijimos que el reconocimiento de deuda pudo ser si-

mulado y que hay indicios de que lo fué, nos basamos en las propias declaraciones de Candelario Quiñones en el referido documento. No damos la importancia que atribuye el demandante al hecho de que al mencionar las cantidades recibidas se hable de dólares y no de pesos, porque desde el cambio de soberanía y no obstante el tiempo hasta hoy transcurrido, ha habido y hay todavía personas que se confunden, hablando de dólares y de pesos indistintamente, como si ambas palabras tuviesen una misma significación.

El demandante hace hincapié en la contestación de Candelario Quiñones a las demandas interpuestas contra él por sus sobrinos, declarando que con motivo de encontrarse ya en una edad muy avanzada y desde hace muchos años abandonado de su esposa, doña Hermógenes Ascencio, y con el fin y propósito de castigar a ésta por su comportamiento desconsiderado para con él, se puso de acuerdo con sus dos sobrinos, y a instancias de éstos, convinieron en simular, como simularon, una deuda, para que a su muerte sus dos sobrinos se incautaran de su propiedad en cobro de la expresada deuda así reconocida.

Hemos dicho que estas manifestaciones, hechas en otros pleitos incoados por los hermanos López Quiñones contra su tío Candelario, no pueden constituir prueba contra los referidos sobrinos, demandados en este caso. Candelario Quiñones tuvo oportunidad de comparecer en la vista del caso incoado contra él por Francisco López y no lo hizo. Se retiró de la vista, alegando que no tenía la prueba en la corte en aquellos momentos. Candelario sabía que la vista había sido señalada para el día 10 de marzo, desde el 25 de febrero, y se retiró de la corte, por conducto de su abogado, cuando se denegó la suspensión del juicio que había solicitado, a pesar de que conocía personalmente, puesto que fué él quien reconoció la deuda, los hechos alegados en su contestación, y de que su testimonio era de una importancia excepcional.

En cuanto a la alegada simulación en fraude de acreedores, arguye el demandante que el reconocimiento de deuda se hizo simuladamente con el propósito manifiesto de castigar o perjudicar a la esposa de Candelario Quiñones, defraudándola en sus derechos como tal esposa y que así lo declara paladinamente dicho Candelario Quiñones. El demandante pretende que aceptemos y demos crédito a la contestación jurada de Candelario Quiñones en los pleitos iniciados contra él por sus sobrinos, es decir, que consideremos probado que el referido Candelario Quiñones fué abandonado por su esposa, que ésta tuvo un comportamiento desconsiderado para con él, que le retiró el poder, y que simuló la deuda con el propósito de castigarla por su conducta, todo esto sin que los demandados hayan podido utilizar el derecho de la repregunta. La esposa de Candelario no era su acreedora, sino condueña de los bienes adquiridos por la sociedad de gananciales y en el caso de que la simulación se hubiese hecho con el propósito de perjudicarla, tendría un derecho claro para establecer la correspondiente reclamación, no como acreedora, sino como dueña de la mitad de los bienes adquiridos durante el matrimonio.

El demandante, que hace descansar su acción en el artículo 1064 del Código Civil, equivalente al 1111 del Código Civil Español, no puede atacar el reconocimiento de deuda como fraudulento mientras encuentre medios para cobrar, y como no ha probado que carezca de estos medios ni ha perseguido todos los bienes de Candelario Quiñones, no tiene derecho a obtener un fallo a su favor.

Refiriéndose a los contratos celebrados en fraude de acreedores, dice Manresa:

"La sentencia de 24 de Septiembre de 1906 ha dado un concepto general de los contratos celebrados en fraude de acreedores, diciendo que son aquéllos que se celebran con la intención de perjudicar a dichos acreedores en sus derechos, sin que sea lícito ni legal confundirlos con los que pueden realizarse sin tal ánimo, aun cuando, por

consecuencia de ellos, pueda sobrevenir a un acreedor determinado perjuicio, debiendo apreciarse su existencia, o por las presunciones que la ley establece o por el resultado de la prueba que en el juicio se practique.'' 8 Manresa, 667.

Y más adelante dice el mismo autor:

''Llegamos, después de lo que acaba de decidirse, a la afirmación de que el primero de los requisitos es la existencia de un crédito: existencia que ha de ser anterior al contrato, aunque la exigibilidad de aquél sea posterior a la fecha de éste, ya que previéndola puede prepararse la insolvencia. La fecha de su crédito y la prioridad respecto a la del contrato, corresponde probarlas, con arreglo a los principios ordinarios, al que intente la acción rescisoria.

''Después se necesitan como requisitos, el fraude, que supone el propósito de perjudicar al acreedor, y la realidad del perjuicio. El fraude se presume, o por la ley (art. 1297 y sus concordantes), o por un conjunto de pruebas que convenzan de él. Pero no basta el propósito del fraude, porque si, no obstante aquél, el acreedor encuentra medios para cobrar, no puede atacar los contratos como fraudulentos, porque su derecho no llega más lejos de la satisfacción de su interés.'' 8 Manresa, 668.

En cuanto al supuesto castigo que Candelario Quiñones quiso imponer a su esposa, conviene aclarar que al conducirse de este modo castigaba también a sus hijos, ya que si la deuda era simulada los privaba de parte de su herencia. Y se da el caso de que la esposa y los hijos así castigados, comparecieran en la corte inferior para reconocer la certeza del crédito reclamado por los hermanos López Quiñones. Y es significativo que Candelario se tomase el trabajo de elaborar una simulación para castigar a su esposa, cuando pudo haber realizado su propósito tomando como base la suma que según su propia confesión en 1931, debía al Dr. González en 4 de mayo de 1929. No hay duda que le hubiese sido más sencillo y fácil reconocer una deuda legítima, obligando a la sociedad de ganaciales, que acudiendo a una simulación.

Los demandados presentaron como prueba tres documentos que fueron examinados por el perito calígrafo Pedro C.

Timothée, testigo de la parte demandante. El perito examinó los *exhibits* 7, 8, y 9, y llegó a la conclusión de que en la firma de los dos primeros son tantas las diferencias comparándolas con las indubitadas, que no cree fuesen escritas por una misma mano. Con respecto al *exhibit* No. 9, declara el perito que la terminación de la letra *d* difiere de la *d* de la firma indubitada, pero que siendo iguales las otras còndiciones, no basta esta diferencia para establecer que estas firmas son hechas por distintas manos. Refiriéndose a estos documentos la corte inferior se expresa así:

"Otro aspecto de esta evidencia que queremos considerar por ser de suyo interesante, son ciertos documentos aparentemente firmados por Candelario Quiñones, y sobre los cuales se adujo prueba pericial. (Exhbs. 7, 8 y 9). El testigo constató estos documentos con las firmas indubitadas que aparecen hechas por Candelario Quiñones en las contestaciones a los pleitos a que antes hacemos referencia, y cuyas contestaciones están juradas. Un estudio hecho por este juez de estas firmas lo lleva a la conclusión lógica de que las firmas que aparecen en el exhibit No. 9 no tienen las características de igualdad o similitud de las que aparecen en los exhibits 7 y 8, comparándolas con las que aparecen en las contestaciones juradas; pero estos exhibits 7 y 8 no tienen la importancia que los demandados les quieren dar, y son anteriores también (por lo menos el exhibit No. 8 tiene fecha enero 19 de 1929) al reconocimiento de la deuda hecho en la escritura. En estos documentos no hay confesión expresa de la deuda y están en la misma situación que la escritura de reconocimiento impugnada plena y ampliamente por Candelario Quiñones, de acuerdo con sus contestaciones juradas a las demandas que interpusieron sus sobrinos."

Las palabras de la corte inferior no parecen estar de acuerdo con lo manifestado por el perito. Con respecto al *exhibit* No. 9, el perito sólo encuentra cierta diferencia entre la letra *d* de la firma dubitada y la misma letra de la firma indubitada. El tribunal sentenciador nota que las firmas que aparecen en dicho documento no tienen las características de igualdad o similitud de las que aparecen en los *exhibits* 7 y

8, comparándolas con las que aparecen en los documentos indubitados. De manera que en la firma de los *exhibits* 7 y 8 donde el perito encuentra tantas diferencias, comparándolas con las indubitadas, la corte observa características de igualdad o similitud, haciendo la misma comparación.

No hemos visto los documentos originales porque no han sido elevados a este tribunal. Hemos leído las copias que obran en los autos y a decir verdad su lectura no ha dejado en nuestro ánimo una impresión de falsedad. Respetamos, no obstante, lo dicho por el perito que examinó los documentos y creemos, como la corte inferior, que los referidos documentos no tienen la importancia que se les atribuye. No transcribimos estos documentos porque están redactados en un lenguaje muy difícil de entender y porque no queremos dar mayor extensión a esta opinión que se va haciendo demasiado larga. Ahí están dichos documentos, que hablan por sí mismos, en los autos, que hemos visto y examinado cuidadosamente y que a nuestro juicio no pueden trasmitir otra impresión a un observador imparcial que la que dejamos apuntada.

■■ Pasamos a discutir ahora la cuestión fundamental, que es la que se relaciona con la rescisión o nulidad de un contrato. Si no estamos equivocados, el demandante solicita la nulidad del reconocimiento de deuda a través del artículo 1064 del Código Civil y cita en su apoyo además de este artículo, otros que se relacionan con la acción rescisoria.

El demandante dice en su alegato que la acción ejercitada tiene por objeto impugnar las actuaciones que el deudor Candelario Quiñones ha realizado en fraude de su derecho, y que tal acción tiene su fundamento y está expresamente autorizada por el artículo 1064 del Código Civil, que copia dos veces en dicho alegato. Luego dice que este precepto está relacionado y concuerda con los artículos 1243, número 3°., y 1249 del mismo código, equivalentes a los 1291 y 1297 del

Código Civil español respectivamente. Los artículos copiados por el demandante en su alegato, en lo pertinente, dicen así:

"Art. 1243. Son rescindibles:

"             .     .     .     .     .     .     .     .     .     .     .

"Los contratos celebrados en fraude de acreedores, cuando éstos no puedan de otro modo cobrar lo que se les deba.

"Art. 1249. Se presumen celebrados en fraude de acreedores todos aquellos contratos en que el acreedor enajenare bienes a título gratuito."

Arguye el demandante que de acuerdo con el artículo 1064 y el 1243 en su inciso tercero, "es preciso alegar y probar que el demandante acreedor ha perseguido los bienes del deudor y que no puede cobrar de otro modo lo que se le debe."

En las últimas páginas de su alegato dice el demandante que "la acción principal y fundamental, causa de su demanda, es la de nulidad de un contrato y de las sentencias que del mismo se derivaron, siendo tal acción la que reconocen los artículos 1252 y 1254 de nuestro Código Civil."

Como se ve, el demandante solicita la nulidad del reconocimiento de deuda y las sentencias dictadas a favor de los demandados, pero se acoge a los artículos 1064 y 1243, inciso tercero, del Código Civil, que tratan de la acción rescisoria, declara que el fundamento legal de su acción es el citado artículo 1064 y dice además que el fundamento de la demanda es la nulidad, siendo esta acción reconocida en los artículos 1252 y 1254 del Código Civil, que tratan de la nulidad, cuya acción pueden ejercitar los obligados principal y subsidiariamente en virtud de un contrato. En un alegato adicional apunta el demandante que "aplicando por analogía la doctrina sentada por este tribunal en el caso de *Cabassa* v. *Nadal,* 23 D.P.R. 744, en que se declaró 'que una acción de nulidad de matrimonio no es incompatible con la de divorcio porque se derivan del mismo acto y tienden al mismo fin,'

puede sostenerse que en este caso la acción de nulidad ejercitada no es incompatible con la de rescisión.''

De toda esta argumentación nosotros deducimos que el demandante ejercita la acción de nulidad a través del artículo 1064 del Código Civil. A nuestro juicio, la acción que de acuerdo con este artículo puede ejercitar el acreedor para impugnar los actos que el deudor haya realizado en fraude de su derecho es de carácter rescisorio. Así lo declaran los comentaristas Scaevola y Manresa. El primero de estos comentaristas se expresa así en el tomo 20, página 978, de sus ''Comentarios al Código Civil'':

''Por último, los acreedores pueden ejercer también la acción de nulidad, como uno de tantos derechos de su deudor, usando de la facultad que les concede el artículo 1111 del Código: así lo ha declarado el Tribunal Supremo, incidentalmente, en su Sentencia de 11 de Noviembre de 1895. Nuestra opinión, sin embargo, difiere. El artículo 1111 del Código concede, efectivamente, acción al acreedor para ejercitar, con el exclusivo fin de cobrar lo que se le debe, todos los derechos y acciones del deudor, exceptuando los que son inherentes a su persona; pero estas acciones o han de ser contra acreedores del deudor o contra terceros por trasmisiones fraudulentas, siendo evidente que las acciones contra estos últimos son por su naturaleza rescisorias y no de nulidad.''

Comentando el inciso tercero del artículo 1291 del Código Civil español, equivalente al 1243 de nuestro código, dice Manresa:

''Quizás de todas las declaraciones de este artículo, ninguna haya tan general como la del número tercero, y por ello, a pesar de que es la más interesante sin duda y la más complicada hipótesis de las enumeradas, la explicación a ella relativa la hemos de hacer con ocasión de los artículos siguientes, o sea del 1294, 1295 y del 1297.

''Aquí, a más de señalar la base que este número encuentra en el art. 1111, debemos deducir dos consecuencias, importantes ambas, fundadas en la misma generalidad del precepto, cuyo desenvolvimiento se deja para el art. 1297. La una es, que como el patrimonio del deudor comprende bienes y derechos, y el fraude puede come-

terse también con relación a éstos, son rescindibles en principio los actos por los cuales se renuncie a un crédito, verbigracia, la condonación. La otra consecuencia es que en la misma generalidad de este precepto se basa la admisión de presunciones particulares de fraude, distintas de las que enumera el art. 1297, pues como dice la sentencia de 25 de Octubre de 1895, 'los contratos fraudulentos y simulados son rescindibles, conforme al número tercero del art. 1291 del Código Civil, y declarándolo así la sentencia, carece de virtualidad la infracción por aplicación indebida de los artículos 40 de la Ley Hipotecaria y 1297 del Código, que sólo establecen presunciones de fraude, mediante las cuales se llega al mismo resultado.' '' 8 Manresa, 667.

El mismo comentarista, refiriéndose al artículo 1297, equivalente al 1249 de nuestro Código Civil, se expresa así:

"En este punto sólo nos toca advertir, que así como son rescindibles las donaciones de bienes, lo son también las remisiones que el deudor otorgue a los que de él lo fueren, y esto, ya por la analogía legalmente declarada entre la condonación y las donaciones, ya porque los bienes comprenden a este efecto todo derecho no personalísimo del deudor, ya porque el artículo 1111, base de esta materia, comprende indistintamente cosas y créditos.

"El supuesto más frecuente en las enajenaciones en fraude de acreedores, no es el de las trasmisiones a título gratuito, así expresado en aquéllas, sino el de enajenaciones supuestas o reales, pero hechas gratuitamente, de ordinario a los probables herederos del deudor, y disfrazadas como enajenaciones a título oneroso. Para éstas, el precepto aplicable no es en realidad el párrafo segundo de este artículo, que se refiere a trasmisiones hechas efectivamente a título oneroso, sino el primero, una vez que se pruebe la simulación cometida, lo cual incumbe al acreedor que ejercita la acción rescisoria. Que éste es el caso más frecuente, lo revela el que casi todos los litigios se refieren, en este particular, a contratos simulados y la aplicación del párrafo primero de este artículo es de rigor, ya porque la realidad una vez conocida se sobrepone a la ficción, ya porque la presunción de fraude se refuerza probándose la simulación, ya porque mediante ésta, el adquirente revela su complicidad y no cabe que alegue la protección de la Ley Hipotecaria, resultando en todo esto que en tales casos hay una dificultad de prueba para el acreedor, vencida la cual, la aplica-

ción de los preceptos legales y la eficacia de su derecho se imponen.''
8 Manresa, 685.

De acuerdo con los comentaristas citados, el acreedor que
desee impugnar los actos realizados en fraude de su derecho,
acogiéndose al artículo 1111 del Código Civil Español, equiva-
lente al 1064 de nuestro código, edición 1930, debe utilizar la
acción rescisoria. El demandante parece entender que puede
ejercitar la acción de nulidad armonizando este artículo con
el 1254 del Código Civil, ed. 1930, según el cual pueden ejer-
citar la acción de nulidad de los contratos los obligados prin-
cipal o subsidiariamente en virtud de ellos. Con respecto a
las personas que pueden ejercitar esta acción, los comenta-
ristas y el Tribunal Supremo de España no están completa-
mente de acuerdo. Scaevola compara la sentencia de 23 de
septiembre de 1895 que reconoce el derecho del tercero para
reclamar la nulidad de los contratos que le perjudican, con
la sentencia de 18 de abril de 1901, que declara que sólo los
contratantes y sus representantes o sucesores tienen acción
para impugnar la validez, y dice que la última es más con-
forme al código, puesto que limita el ejercicio de la acción a
la esfera de las personas mismas obligadas por el contrato,
pero arguye que, a despecho del tenor literal del código, la
primera es buena en términos generales y propone, para ar-
monizar ambas teorías, la solución que a continuación se ex-
presa:

''Sostener en absoluto la limitación del artículo 1302, reduciendo
el derecho a los obligados por el contrato, traería graves injusticias
mediante posibles y sencillas confabulaciones; y cuando esto no
fuera, por considerarse que todas o la mayor parte de tales injusticias,
como sucedía en el caso de la Sentencia de 23 de Septiembre de 1895,
tendrían más natural remedio en la rescisión por fraude de acreedores
que en la nulidad, según hicimos notar en nuestra obra de Jurispru-
dencia del Código Civil, siempre resultaría, de la referida limitación,
la posibilidad de hacer sufrir a una tercera persona, sin concederla
derecho de protesta, las consecuencias, por ejemplo, de un contrato
inmoral. Esto impone la necesidad de habilitar a los terceros para

el ejercicio de la acción, como en dicha sentencia se reconoce; pero sin dejar de tener también en consideración que la facultad de estos terceros no puede llegar al extremo de menoscabar la que las partes contratantes tienen, en ciertos casos, para confirmar y convalidar sus convenciones nulas.

"Basta aplicar las conclusiones que obtuvimos en el comentario precedente para resolver de una manera muy clara y muy justa dificultad aparentemente tan grave. Hay contratos, hemos dicho, que se declaran nulos aun sin contradecir el interés general, por consideración a la situación de los contratantes, en que, por lo tanto, el perjudicado por ellos, así puede dejar pasar el lapso de la acción sin reclamar la invalidez de lo convenido, como lo puede ratificar expresamente. A estos contratos, que hemos calificado de anulables y convalidables, no puede llegar la oposición de las terceras personas sin contradecir los más importantes fundamentos de la nulidad. Pero en aquellos otros convenios en los que se ha atentado al interés público, en que la causa de nulidad es permanente, definitiva e irremediable, en que la ley no puede reconocer la existencia jurídica de la estipulación, ni sancionar tampoco sus consecuencias, ¿quién duda de que podrá la tercera persona interesada oponerse al contrato, cuando de su subsistencia se le siga perjuicio? Todo, pues, se reduce, una vez más, a que la nulidad se halle impuesta por razones de interés público o a que dependa de motivos de utilidad del contratante; en el segundo caso, único que generalmente tuvo a la vista el legislador al tratar de la nulidad, la acción no corresponde sino a las personas obligadas, según determina el artículo 1302; en el primero, toda persona interesada, aun siendo extraña a la celebración del contrato, podrá pedir y obtener la declaración de invalidez." Scaevola, Comentarios al Código Civil, tomo 20, pág. 976.

Manresa expone su criterio del modo siguiente:

"Tiene declarado la jurisprudencia en sentencia de 18 de abril de 1901, de acuerdo con la regla aquí formulada, que 'quien no ha sido parte en un contrato, ni tiene causa ni representación de los que intervinieron en él, es evidente, conforme a lo dispuesto en los artículos 1257 y 1302 del Código Civil, que carece de acción y personalidad para impugnar la validez de aquél.'

"     .     .     .     .     .     .     .     .     .     .

"El problema más interesante en este punto es si puede ejercitar la acción de nulidad quien, sin ser obligado en ningún concepto, es

perjudicado en sus derechos respecto a uno de los contratantes, si se atribuye eficacia al contrato nulo por éste celebrado. En esto punto, que en rigor consiste en saber si este artículo tiene carácter limitativo, o, por el contrario, permite a los perjudicados por el contrato intentar la acción de que se trata, y si, por tanto, los acreedores burlados tienen como medio de defensa, a más de la acción rescisoria, la de nulidad, parece deducirse esto último de la sentencia de 23 de septiembre de 1895, en la cual se reconoce a un legatario la acción de nulidad, para defender la eficacia de su legado, de contratos simulados, celebrados por un heredero, y antes apoderado del causante, declarándose que 'el art. 1302, al establecer que pueden ejercitar la acción de nulidad de los contratos obligados principal o subsidiariamente en virtud de ellos, no excluye el derecho de ejercitarla aquellos terceros a quienes perjudica la obligación; remedio que, por tanto, ha de alcanzar en buena lógica al que ve burlado su derecho de legatario por créditos que consideraba y resultan simulados.'

"Otros muchos fallos (y entre ellos, los de 8 de Julio y 12 de Octubre de 1916, 8 de Octubre de 1919, 12 de Noviembre de 1920, 30 de Mayo de 1925 y 20 de Noviembre de 1926), declaran, en igual sentido, que si bien este artículo 1302 no establece el derecho de terceras personas a ejercitar la acción de nulidad de los contratos, tampoco los niega, por lo cual no sólo están facultados para ejercitar dicha acción los obligados principal o subsidiariamente a virtud de tales contratos, sino también los terceros a quienes perjudique la obligación.

"Pero otras sentencias, como las de 18 de Diciembre de 1901 y 23 de Noviembre de 1903, declaran, por el contrario, de un modo bien terminante, que sólo las personas obligadas principal o subsidiariamente por virtud de un contrato, pueden entablar la acción de nulidad.

"Nosotros estimamos que ésta es la única interpretación que se deduce rectamente del art. 1302. Los terceros no necesitan la acción de nuliadd a que este artículo se refiere. O el contrato les perjudica realmente o no. Si les perjudica, válido o nulo el acto o contrato, pueden entablar la acción rescisoria. Si no les perjudica, sea nulo o válido, no pueden tener en el asunto ningún interés." 8 Manresa, 707.

Así se expresan los dos ilustres comentaristas. Manresa, a pesár de las últimas decisiones del Tribunal Supremo de España declarando que si bien el código no establece el de-

recho de tercera persona para ejercitar la acción de nulidad de los contratos, tampoco lo niega, mantiene el criterio de que sólo las personas obligadas principal y subsidiariamente por virtud de un contrato pueden ejercitar la referida acción de nulidad. Este criterio parece ser el que más se ajusta a la letra del código. El mismo Scaevola, que así lo reconoce, propone, para conciliar ambas teorías, que se autorice la acción de nulidad por un tercero cuando se imponga por razones de interés público, y por las personas obligadas exclusivamente, según determina el artículo 1302 del Código Civil Español, cuando la nulidad dependa de motivos de utilidad del contratante. El artículo 1294 de nuestro Código Civil especifica las personas que tienen derecho a ejercitar la acción de nulidad. ¿Excluye esta disposición expresa del código a las personas que no quedan obligadas principal y subsidiariamente por el contrato? Cuestión es ésta que no resolvemos en el presente caso por no ser necesario para llegar a una solución. Ya se trate de una acción rescisoria o de nulidad, es preciso que el demandante demuestre su interés para que pueda establecerse su derecho. El interés surge del perjuicio. Para el ejercicio de cualquiera de estas acciones se necesita que se haya irrogado un perjuicio. Sea nulo o válido el contrato, si no perjudica al acreedor no puede existir un derecho de acción. En este caso no se ha demostrado el valor de los bienes de Candelario Quiñones ni ahora ni cuando se llevó a cabo el reconocimiento de deuda, ni se han perseguido todos sus bienes. Si no sabemos el valor de los referidos bienes, ¿cómo podemos apreciar que el demandante ha sido perjudicado? Si el acreedor no demuestra que no tiene medios de cobrar, no puede decirse que hay un perjuicio. Sus derechos no pueden ir más allá de su interés. La realidad del perjuicio, como muy bien dice Manresa, se aprecia por la imposibilidad del pago.

*No ha lugar a la reconsideración solicitada.*

El Juez Asociado Señor Wolf está conforme con el resultado.